IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| FLORA KIM, individually and as Guardian Ad Litem for W.K., and DAVID KANG,<br><br>        Plaintiffs,<br>  vs.<br><br>CROCS, INC., ET AL.<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO. 16-00460 JAO-KJM<br><br>ORDER GRANTING IN PART AND DENYING IN PART: (1) GRANTING IN PART AND DENYING IN PART DEFENDANT/ THIRD-PARTY DEFENDANT/CROSS-CLAIMANT/ CROSS-CLAIM DEFENDANT OTIS ELEVATOR COMPANY'S MOTION TO PRECLUDE TESTIMONY OF JOHN W. KOSHAK AND STRIKE REPORT OF ELEVATOR SAFETY SOLUTIONS, INC.; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT/THIRD-PARTY DEFENDANT/CROSS-CLAIMANT/ CROSS-CLAIM DEFENDANT OTIS ELEVATOR COMPANY'S MOTION TO PRECLUDE TESTIMONY OF JOSEPH L. STABLER AND STRIKE REPORT OF STABLER ASSOCIATES, INC. |

**ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANT/THIRD-PARTY DEFENDANT/CROSS-CLAIMANT/ CROSS-CLAIM DEFENDANT OTIS ELEVATOR COMPANY'S MOTION TO PRECLUDE TESTIMONY OF JOHN W. KOSHAK AND STRIKE REPORT OF ELEVATOR SAFETY SOLUTIONS, INC.; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT/ THIRD-PARTY DEFENDANT/ CROSS-CLAIMANT/ CROSS-CLAIM DEFENDANT OTIS ELEVATOR COMPANY'S MOTION TO PRECLUDE TESTIMONY OF JOSEPH L. STABLER AND STRIKE <u>REPORT OF STABLER ASSOCIATES, INC.</u>**

# INTRODUCTION

This products liability action arises out of an accident at the Hilton Hawaiian Village where W.K.'s shoe became entrapped in an escalator. Defendant/Third-Party Defendant/Cross-Claimant/Cross-Claim Defendant Otis Elevator Company ("Otis") seeks to exclude the expert opinions and testimony of John Koshak, Plaintiffs Flora Kim and David Kang's (collectively "Plaintiffs") expert, and Joseph Stabler, Defendant Crocs, Inc.'s ("Defendant") expert. For the reasons articulated below, the Court GRANTS IN PART AND DENIES IN PART Otis' Motions.

# LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence ("FRE") governs the admissibility of expert evidence.[1] *Clausen v. M/V New Carissa*, 339 F.3d 1049,

---

[1] FRE 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(continued . . .)

1055 (9th Cir. 2003).  FRE 702 allows the admission of expert testimony when scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue.  Fed. R. Evid. 702; *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001), *amended by* 246 F.3d 1150 (9th Cir. 2001) (To be admissible, "expert testimony must . . . address an issue beyond the common knowledge of the average layman").

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court, focusing on the admissibility of scientific expert testimony, found that such testimony is admissible only if it is both relevant and reliable.  *Id.* at 589. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").  The court must make "a preliminary assessment of

---

(. . . continued)
       (c) the testimony is the product of reliable principles and methods; and

       (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

whether the reasoning or methodology underlying the testimony is scientifically

valid and . . . whether that reasoning or methodology properly can be applied to the

facts in issue." *Daubert*, 509 U.S. 592-93. The Court's gatekeeping function in

ensuring the reliability and relevancy of expert testimony extends to all expert

testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 146 (1999).

A. Reliability

*Daubert* outlined the following nonexclusive factors that may bear on the

determination regarding the reliability of a particular scientific theory or technique:

"(1) whether the theory can be and has been tested, (2) whether the theory has been

peer reviewed and published, (3) what the theory's known or potential error rate is,

and (4) whether the theory enjoys general acceptance in the applicable scientific

community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017)

(citing *Daubert*, 509 U.S. at 593-94).

> The test of reliability is flexible and *Daubert's* list of specific factors
> neither necessarily nor exclusively applies to all experts or in every
> case.[] The list of factors was meant to be helpful, not definitive,[]
> and the trial court has discretion to decide how to test an expert's
> reliability as well as whether the testimony is reliable,[] based on the
> particular circumstances of the particular case.

*Primiano*, 598 F.3d at 564 (citations omitted) (internal quotations omitted).

District courts have broad latitude in determining reliability and deciding

how to determine reliability. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373

F.3d 998, 1017 (9th Cir. 2004). "A district court may permissibly choose not to

examine factors that are not 'reasonable measures of reliability in a particular case.'" *Murray*, 870 F.3d at 922.

The *Daubert* inquiry focuses on the reliability of "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). The district court's function is to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

B. Relevance

"The requirement that the opinion testimony 'assist the trier of fact' 'goes primarily to relevance.'" *Primiano*, 598 F.3d at 564 (citation omitted). The relevancy, or "fit," requirement, demands that "proposed expert testimony is 'relevant to the task at hand,' . . . i.e., that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315 (citation omitted). The district court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, 738 F.3d* at 969-70; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) (identifying second *Daubert* requirement that an expert's opinions assist the trier of fact). Experts who satisfy FRE 702 "may

testify and the jury decides how much weight to give that testimony." *Primiano*, 598 F.3d at 565.

## DISCUSSION

**A.** **Otis' Motion to Preclude Testimony of John W. Koshak and Strike Report of Elevator Safety Solutions**

Otis seeks an order striking Elevator Safety Solutions, LLC's March 2, 2018 report and precluding Mr. Koshak, its principal, from testifying. Alternatively, Otis requests that portions of the report relating to Mr. Koshak's February 18, 2018 site inspection be excluded, and that Mr. Koshak be precluded from testifying about the same.

Plaintiffs allege that Otis negligently breached its duty to safely operate and maintain the escalator involved in the incident. Mr. Koshak opined that "[t]he lack of maintenance and inspections and the resulting condition of the escalator was more likely than not a cause of W.K.'s foot becoming entrapped in the escalator." Mot., Ex. A at 36, ¶ 10 (opinion no. 10). He explained that a side-of-step entrapment occurred in this case and that "[t]he gap between the moving step, in combination with the stationary skirt's friction, are the two primary mechanisms that cause or contribute to this type of entrapment." *Id.* at 3-4, ¶ B4.

Otis seeks exclusion of Mr. Koshak's report and testimony on the following grounds: (1) the condition of the subject escalator during his February 2018 site inspection is not relevant to the condition of the escalator in 2014, which renders

his opinions unreliable and irrelevant; (2) the step-to-skirt gap measurements in Figure 19 (2018 step gap measurements) in his report and Exhibit 5A (annotations to Figure 19) to his deposition contain errors and are unreliable; (3) Mr. Koshak's opinions regarding the escalator skirt panel are unreliable because they are premised on assumptions and speculation about the condition of the skirt panel at the time of the incident; and (4) Mr. Koshak's opinions regarding causation rely on speculation and cherry-picked facts.  The Court addresses each in turn.

1. The Condition of the Subject Escalator at the Time of the Incident is not Logically Connected to the Condition Observed at the February 2018 Site Inspection

Otis argues that Mr. Koshak's opinions are irrelevant and poisoned because they are based on fundamentally unreliable and flawed data and are based on the assumption that the noncompliance and conditions he observed during his 2018 site inspection would have existed in 2014, when the incident occurred.  In particular, Otis focuses on the lack of a logical connection between the escalator's observed condition in 2018 and its condition in 2014 with respect to the step-to-skirt gap measurements and the damaged skirt panel.

Plaintiffs counter that Mr. Koshak's opinions are not solely or even primarily based on his site inspection; they are based on maintenance records from the relevant period, the step-skirt performance index test the day after the entrapment, and deposition testimony from Otis' corporate representative and Dr.

Kim.  Plaintiffs submit that because Mr. Koshak's observations are consistent with the information and records available from the relevant time period, they are logically connected.

"Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically.  Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662-63 (11th Cir. 1988) (citing *Breidor v. Sears, Roebuck and Co.*, 722 F.2d 1134, 1138 (3rd Cir. 1983)).  When a logical basis exists for an expert's opinion, credibility and weight are determined by the jury, not the trial judge.  *Breidor*, 722 F.2d at 1138-39.

### a.  Noncompliance

It is Otis' position that Mr. Koshak's opinions about noncompliance are not relevant because he has failed to establish that the noncompliance he purportedly observed in 2018 was present in 2014.  The Court agrees that the requisite logical connection is lacking.  Although Mr. Koshak reviewed maintenance records, the most recent records he reviewed were from March 2, 2015, nearly three years prior to his site inspection, and after the date of the incident.  Mot., Ex. A at 19.  Plaintiffs argue that Mr. Koshak's observations about gap size were consistent with the maintenance records from the relevant time period showing that Otis failed to

routinely measure the step-to-skirt gap size and perform a step-skirt index performance test.  However, in the portion of deposition testimony cited by Plaintiffs, Mr. Koshak admitted that he lacked knowledge of the actual condition but posited:  "it is representative that if a company leaves it like this today, they likely left it like that in the past."[2]  Opp'n, Ex. C at 69:24-70:6.  When asked about the purpose of Figure 19,[3] Mr. Koshak replied:

> An illustration of whether this escalator had compliance issues and utilizing that information to make some assumptions of, if it's not compliant now, could I assume, based on what I'm seeing, that it wasn't compliant then.  How sure could I put that probability within a reasonable degree of certainty. . . . But this tells me, overall, that there are problems, that this escalator exceeds the deltas and exceeds the widths, the width of the gap.  And then, critically, do they exceed that in an area that was adjacent to, near the incident, and that's what all that tells me.

Mot., Ex. F at 67:17-68:8.  Mr. Koshak has offered nothing more than his assumption to support this proposition.  Hence, there is an absence of evidence reflecting that the condition of the subject escalator in 2018 was connected to its condition at the time of the incident.  To this point, the Court finds *Jones v. Otis Elevator Co*., 861 F.2d 655 (11th Cir. 1988), instructive.

In *Jones,* the plaintiff alleged that an elevator she was riding failed to stop on the ground floor and hit the bottom of the elevator shaft, bouncing several times.

---

[2]  This is consistent with his testimony at the *Daubert* hearing.

[3]  Figure 19's deficiencies will be discussed below.

861 F.2d at 657. The Eleventh Circuit upheld the district court's admission of expert testimony that elevator conditions existing in 1987 also existed in 1984 because the expert "had over 30 years of experience as an elevator engineer and was extremely familiar with the operation and appearance of [the] elevator stopping device" and "[h]is conclusion that the box had not been serviced in years or maybe never was within his range of knowledge as an elevator expert." *Id.* at 663. The expert drew his opinions about the similarity in conditions over time from "his position that had a qualified person inspected the settings, this person would have corrected the deficiency" and his observation that "due to a heavy layer of dust and dirt which had accumulated on the cover over the setting devices, it appeared no one had removed the covering to check the settings in two to three years."[4] *Id.* at 662.

---

[4] One of the primary inquiries when there is a gap in time between an incident and inspection is whether there was a change in the condition of the subject premises. *See, e.g.*, *Peterson v. Young Men's Christian Ass'n of Greater New Orleans*, No. CIV. A. 91-2278, 1992 WL 161072, at *1 (E.D. La. June 18, 1992) ("As aforesaid, most of the report focuses on the physical layout of the building and the procedures employed by the YMCA which have not been changed by the vacancy of the building and these factors alone are sufficient to enable the expert to reach a reasonably accurate conclusion and, thus, his report is relevant."); *Bailey v. Stanley Access Techs., Inc.*, No. 3:14-CV-72-SA-JMV, 2015 WL 6828921, at *10 (N.D. Miss. Nov. 6, 2015) ("[W]hile the mere passage of time may not render Panish's testimony irrelevant, changes in the condition of the doors in the time between the alleged incident and the inspection does. . . . Panish's opinion that the subject door's sensor was maladjusted eighteen months after the incident is not relevant, and may tend to mislead the jury because, 'it's what was happening at the time of (continued . . .)

By contrast, Mr. Koshak has not offered any evidence establishing that the subject escalator did not undergo any changes in the period between the incident and his site inspection. Instead, the record reflects that an estimated 250,000 people ride the subject escalator annually. Mot., Ex. C at 59:10-17. This means that in the period between the incident and the site inspection, approximately 875,000 passengers rode the subject escalator.

Moreover, Mr. Koshak testified that the escalator was susceptible to daily changes to its condition. Reply, Ex. A at 53:4-6 ("Only thing that's fair to say, absent being there the day of the incident, any day that passes, the condition of the escalator would have changed."). He even acknowledged that the passage of time between the incident and his site inspection was significant. *Id.* at 53:5-8 ("In the length time that this one – between the incident and my visit, that's a long, long time."). Indeed, this was the reason he declined to perform step-skirt performance index testing. *Id.* at 52:11-16 (testifying that he did not conduct index testing on

---

( . . . continued)
the accident that counts.'"); *cf. LeBoeuf v. K-Mart Corp.*, 888 F.2d 330, 333 (5th Cir. 1989) (affirming the district court's exclusion of evidence obtained by investigators concerning the condition of K-Mart floors two years after an accident on the bases that it lacked probative value due to the remoteness in time; that a subsequent condition was not relevant; and that even if relevant, the prejudicial effect would outweigh the probative value).

his site visit because he did not think it would be relevant to the condition of the escalator at the time of the incident two years after the fact).

The foregoing demonstrates that Mr. Koshak has failed to show that the subject escalator's condition in 2018 is reflective of its condition at the time of the incident.

Even where relevant, opinions and/or testimony are "admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones*, 861 F.2d at 662; *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018) (citation omitted) ("Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion."). In the present case, there is too great an analytical gap between the subject escalator's condition observed during the 2018 site inspection and the opinion that its condition at the time of the incident was more likely than not a cause of W.K.'s foot becoming entrapped. Consequently, the Court finds that Mr. Koshak lacked the requisite facts to enable him to express a reasonably accurate conclusion regarding the specific condition of the subject escalator at the time of the incident.

b. <u>Damaged Skirt Panel</u>

Otis similarly contends that Mr. Koshak's opinion that the damaged skirt panel on the right side of step 23 was the cause of W.K.'s entrapment[5] is irrelevant because he has not connected his 2018 observations to the condition of the subject escalator at the time of the incident. As explained above, Mr. Koshak has not shown a logical connection between the condition of the subject escalator in 2014 and 2018. He has not established that the subject escalator did not undergo changes between the incident and his site inspection, and he in fact acknowledged that he does not know whether step 23 was in the same condition in 2014. Reply, Ex. A at 184:11-14 ("Q: But I think you already testified, you don't know whether, on September 10th, 2014, step 23, this area we see in figure 20, had this same condition; right? A: Obviously not."). At the *Daubert* hearing, Mr. Koshak confirmed that he could not determine when the damage he observed on step 23 occurred. Doc. No. 408 at 26:24-27:2.

These concessions notwithstanding, Plaintiffs posit that the subject escalator's 2018 condition is logically connected to its 2014 condition because Mr. Koshak's opinion is based on: Dr. Kim's deposition testimony that W.K.'s foot became entrapped approximately one-fifth of the way down the escalator; Otis' step-skirt performance index test conducted the day after the incident, which

---

[5] Reply, Ex. A at 182:16-183:23.

showed a large deviation in that area; and observations about the damage indicating that it was a defect that had existed for some time. The information relied upon by Plaintiffs as establishing a logical connection is unpersuasive.

First, the record reflects that Mr. Koshak disregarded Dr. Kim's testimony and altered it to fit his opinion. Dr. Kim testified that entrapment occurred

> **pretty high up on the escalator, so probably just within, like, a couple of seconds after we stepped on the escalator**, because the accident occurred or stated to happen when we were – it's a pretty long escalator. It happened pretty high up, so I don't know where this step is from, like, the beginning to the end.

Reply, Ex. C at 167:1-6 (emphasis added). When questioned whether her recollection was that the entrapment happened somewhere up at the top, she responded: "yes, **definitely** within the first fifth of the way down, the first – I mean it was pretty quick after we got on." *Id.* at 167:12-16 (emphasis added). Mr. Koshak interpreted this testimony to establish that entrapment occurred within the top half of the subject escalator.

> So now you have 34 steps. 23 is in the – just about a third – I didn't do the math –which is kind of where that hump is. It's within a third of – a third of the way – two-thirds of the way, one-third from the top, and then you have Flora Kim's testimony. She scientifically says it was in the first fifth. I don't know that anybody measures in life in fifths, but maybe she does. But clearly it was in the upper half, I would say. And my experience is, people say almost anything when they're under that kind of stress and their recollections can be biased, but, clearly, I think in the upper half would be a fair estimation.

*Id.*, Ex. A at 182:16-183:3. While the Court of course agrees that the top one-fifth of the escalator falls within the top half of the escalator, Mr. Koshak appears to have inaccurately extrapolated from Dr. Kim's testimony that entrapment occurred anywhere within the upper half of the escalator, when she unequivocally stated that entrapment occurred within the top one-fifth of the escalator and likely within a couple of seconds of stepping onto the escalator.

Second, the step-skirt performance index test results were discredited by Mr. Koshak himself. He expressly opined that

> Otis did not perform the Step/Skirt Performance Index Test correctly after entrapment. First, the test results demonstrate that the test was not set up correctly as the loaded gap cannot physically be a negative number. Second, the four tests show index results of 0.130, 0.051, 0.161, and 0.056. These numbers are impossible for a brand new, perfectly adjusted escalator. It is absolutely impossible to get these results on a RBC escalator manufactured in 1969.

Mot., Ex. A at 36 ¶ 8. Within the "Step/Skirt Performance Index Test After Incident" section in his report, he stated that the

> IMD-1 was incorrectly set up . . . This test graphs a physical impossibility; therefore, the tests are invalid. Also this result is not just from one of the four tests, it is in all four tests. **This eliminates this test to determine what the Index was contemporarily with the incident.**

*Id.* at 31, ¶ F8 (emphasis added). He further explained that because certain recorded values (caused by the faulty setup) were an impossibility, "this indicates with more emphasis that the testing was flawed." *Id.* at 34, ¶ F11. It is unclear

how test results that Mr. Koshak rejected could be relied upon to show a logical connection between the subject escalator's 2014 and 2018 conditions.  Notably, Mr. Koshak elected not to conduct a skirt-step performance index test during his site inspection, which left him without comparative data.  In view of his refutation of the efficacy of Otis' testing, his selective acceptance of the testing reflecting a deviation in the upper third of the escalator renders his opinion about the skirt panel unreliable.  *E.E.O.C. v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015) ("'Cherry-picking' data is essentially the converse of omitting it: just as omitting data might distort the result by overlooking unfavorable data, cherry-picking data produces a misleadingly favorable result by looking only to 'good' outcomes."); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (finding inadmissible an expert's opinion that "cherry-picked observational studies [] support[ing] his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion" because it did "not reflect scientific knowledge, [wa]s not derived by the scientific method, and [wa]s not 'good science'").

At the *Daubert* hearing, Mr. Koshak clarified that he could rely on the data in Figure 26[6] of his report because although the test was not set up properly, the resulting 2.9 mm measurement was proportionately accurate.  Doc. No. 408 at

---

[6]  Figure 26 shows the loaded gap data.  Mot., Ex. A at 34.

44:9-11.  Mr. Koshak explained that Figure 26 reflects a peak at approximately 2/3 up the escalator (or 1/3 from the top of the escalator), *id.* at 38:6-10, representing the gap between the side of a step and the skirt.  *Id.* at 26:3-20.  When queried by Otis' counsel about the directionality of the test (bottom to top versus top to bottom), however, Mr. Koshak testified that while he believed the test was performed from bottom to top,[7] he could not verify that fact.  *Id.* at 45:16-46:6.  Even accepting that Mr. Koshak reasonably relied on the test results from Figure 26, such data alone is insufficient to draw a logical connection between the incident and the site inspection for the reasons already stated.

Third, Mr. Koshak's observations alone do not create the requisite logical connection where, as here, he has not shown that the escalator did not undergo changes between the incident and his site inspection.  Without any assurance that the subject escalator's 2018 condition is sufficiently similar to its 2014 condition, the Court must exclude opinions that are based on the purportedly similar conditions between the incident and the site inspection.  Accordingly, the Court excludes Mr. Koshak's opinions regarding noncompliance, the step-to-skirt gap measurements, and the damaged skirt panel to the extent the opinions rest on the presumption that the escalator's 2018 condition reflects its condition at the time of

---

[7]  Mr. Koshak stated that he believes he knows this from Otis' inspector's deposition.  Said deposition was not submitted in connection with this Motion.

the incident.  Opinion no. 5—"Otis failed to ensure the skirt panels were smooth and free from cavities and indentions that would initiate entrapment"— is affected by this ruling; therefore, it and any related discussions, evidence, and/or testimony are excluded.  Notably, Mr. Koshak conceded that opinion no. 5 relied on his site inspection.  *Id.* at 5:19-6:5.

The Court finds that opinion nos. 1-4 and 6-8[8] do not rely upon and are not tainted by the site inspection.  Thus, given Mr. Koshak's qualifications and expertise in escalator maintenance, which Otis does not challenge, these opinions are reliable and relevant.  As a result, any discussions, evidence, and/or testimony concerning maintenance based on Mr. Koshak's review of documents and other materials will be permitted.

2.  <u>Step-to-Skirt Gap Measurements in Figure 19 in Mr. Koshak's Report and Exhibit 5A to His Deposition</u>

Otis also argues that because Mr. Koshak's opinions are based on inaccurate step-to-skirt gap measurements, they lack a reliable factual basis, and warrant exclusion of his opinions.  Plaintiffs counter that all but four measurements were correctly listed in Mr. Koshak's report, and that he provided corrections at his deposition, which were then included in his rebuttal report.

---

[8]  Otis also challenges opinion nos. 9 and 10.  The Court will later address these opinions.

The errors contained in Figure 19 and Exhibit 5A, coupled with Mr. Koshak's inability to rehabilitate these exhibits and/or his prior testimony, further support the Court's determination that opinions related to the site inspection must be excluded.

Mr. Koshak took gap measurements of the subject escalator utilizing three methods: notes by Plaintiffs' counsel Eric Seitz based on measurements stated by Mr. Koshak at the site inspection; videotape; and photographs taken by Mr. Koshak as he measured each step. There is no dispute that Figure 19 is rife with errors. Plaintiffs' counsel conceded that it was flawed, and during his deposition and at the *Daubert* hearing, Mr. Koshak admitted that Figure 19 contained numerous errors. Mot., Ex. F at 83:10-84:5; Doc. No. 408 at 18:24-19:1; 21:2-9. Although Exhibit 5A to Mr. Koshak's deposition corrected errors in Figure 19, Exhibit 5A[9] still contained multiple errors. Reply at 4-7.

For example, there were inconsistencies between the Exhibit 5A data and the data sources. Additionally, the photographs taken by Mr. Koshak, upon which he relied, were not sequentially numbered because several images were taken in burst mode on his iPhone. He was consequently unable to correlate certain photographs to a specific step. Mot., Ex. F at 135:2-19; 137:6-24. Mr. Koshak also failed to

---

[9] Exhibit 5A is an annotation of Figure 19. Mot., Ex. F at 129: 9-12. Exhibit 5A and Figure 1 in Mr. Koshak's May 18, 2018 rebuttal report contain the same data.

document step numbers as he took photographs, instead electing to employ an after-the-fact identification method.  *Id.* at 136:19-137:5.  This caused him to attribute the same photograph to different steps, which undermines the accuracy of the step identified in any given photograph.[10]  *Id.*, Ex. 6 to Ex. F; Mem. in Supp. of Mot. at 18 (Table 2).

The deficiencies do not end there.  Mr. Koshak's testimony about his reliance on the various sources of data shifted during the course of his deposition.  Initially, he testified that Mr. Seitz's notes, as opposed to Figure 19, contained the correct values, and that his opinions were based on those actual measurements.  *Id.*, Ex. F at 83:4-9.  After creating Exhibit 5A during his deposition, he stated that "the numbers are actually directly taken with, apparently, four errors, from the video and/or photographic evidence of the actual measurements of the tool in the side-of-step."  *Id.* at 129:15-18.  He could not explain the discrepancy between the photographs and Mr. Seitz's notes and characterized the photographs as "fact" and agreed that the video is the best record of capturing what he called out for each step measurement.  *Id.* at 132:9-24.

---

[10]  At the *Daubert* hearing, Mr. Koshak testified that he had recently reviewed the photographs more carefully, including the metadata and time stamps, and now has greater certainty about step numbers accurately corresponding to photographs.  He acknowledged that no such confirmation was made in his report, rebuttal report, or deposition, but asserted that his opinions would not differ.  Doc. No. 408 at 24:5-9; 24:19-25:4.

Mr. Koshak has admitted that "a significant part of [his] opinions rely on the noncompliance nature as illustrated in [Figure] 19," Mot., Ex. F at 68:15-18, and he did not change his opinions in the rebuttal report;[11] therefore, the aforementioned errors and inconsistencies render his opinions unreliable. At the initial hearing, Plaintiffs' counsel attempted to explain away Mr. Koshak's testimony by offering her interpretation of the true intention of his statement and arguing that his opinions are not primarily founded on the site inspection. Doc. No. 378 at 107:2-108:20. During the *Daubert* hearing, Mr. Koshak claimed that he meant that he substantially relied on the corroboration provided by Figure 19 and that in fact, his report was largely complete before he ever conducted the site inspection. Doc. No. 408 at 19:11-20.

Even accepting as true the purported distinction between relying on Figure 19 and corroborating already-existing opinions with Figure 19, and later Exhibit 5A, it is unclear how sound and reliable opinions could be corroborated by data that Mr. Koshak himself admits had a high rate of error. Accordingly, opinions founded upon or corroborated by the step-to-skirt gap measurement data are

---

[11] In the rebuttal report, Mr. Koshak noted that his corrected Figure 19 was shown in Figure 2. Opp'n, Ex. D at 8. This appears to be a typographical error because Figure 1 contains the corrections to Figure 19. *Id.* at 9. Figure 2 is an image of gap instructions from IMM 30.3 (Excerpts). *Id.* at 10. The only substantial change identified by Mr. Koshak was that "the Sum of Gaps created another Code violation at Step 7." *Id.* However, Figure 1 did not change the opinions he offered in his original report.

excluded because they are unreliable. This again affects opinion no. 5, and opinion no. 10, as explained below.

### 3. Mr. Koshak's Causation Opinions

Otis' final argument is that Mr. Koshak's causation opinions must be excluded because they rely on unreliable and cherry-picked data. The causation opinions at issue are as follows:

> 9 – Otis's failure to properly maintain, inspect, adjust, and repair the escalator failed to conform to the reasonable standard of care in the industry.

> 10 –The lack of maintenance and inspections and the resulting condition of the escalator was more likely than not a cause of W.K.'s foot becoming entrapped in the escalator.

*Id.*, Ex. A at 36. The Court has excluded conclusions founded upon noncompliance, the step-to-skirt gap measurement data, and the damaged skirt panel to the extent they connect observations from the 2018 site inspection to the condition of the subject escalator at the time of the incident. Arguably, the exclusion of the foregoing substantially, if not entirely, undercuts Mr. Koshak's causation opinion no. 10. Causation opinion no. 10 is therefore excluded.

By contrast, causation opinion no. 9 can stand without the excluded information based on Mr. Koshak's experience and knowledge of escalator maintenance and repair, along with his review of maintenance and other records. Thus, any questions about the weight of this opinion should be resolved by a jury.

In accordance with the above analysis, the Court GRANTS IN PART AND DENIES IN PART Otis' Motion to Preclude Testimony of John W. Koshak and Strike Report of Elevator Safety Solutions.

**B.**    **Otis' Motion to Preclude Testimony of Joseph L. Stabler and Strike Report of Stabler Associates, Inc.**

Otis moves to strike Stabler Associates, Inc.'s April 27, 2018 report and preclude Mr. Stabler, its principal, from testifying. In the alternative, Otis requests that the Court strike portions of the report relating to Mr. Koshak's February 18, 2018 site inspection and preclude corresponding testimony. Defendant disputes Otis' assertion that Mr. Stabler's opinions rely significantly on Mr. Koshak's observations. According to Defendant, Mr. Stabler's opinions are derived from his experience; facts and evidence from the case; and applicable industry codes and standards.

Mr. Stabler opined, to a reasonable degree of escalator safety and mechanical safety, that a number of causes contributed to W.K.'s entrapment. Mot., Ex. B at 38 ¶ 11.1. During the course of forming his opinions and preparing his report, Mr. Stabler reviewed 41 documents provided to him, as well as codes, standards, literature, and documents from his personal files. *Id.* at 1-4 In lieu of conducting a site inspection, Mr. Stabler referenced details and observations from Mr. Koshak's site inspection:

That Plaintiff's expert, John Koshak physically inspected the subject
escalator on site on February 18, 2018 and measured the step-skirt gap
and observed the operation and condition of the escalator, Mr. Koshak
also photographed and videotaped the escalator, and observed that the
skirts of the escalator were wet with a friction reducing lubricant; that
there were striations on the skirt indicative of a scraping contact with
moving steps; that some escalator steps were touching the skirt(s) with
no gap; that skirt panel moved (or deflected) with 30 lbf applied
against it; and that a skirt panel was damaged on the same side as
W.K.'s entrapment.  Mr. Koshak also noted abrasions and striations
on the skirt panels consistent with sliding step contact due to
misalignment or lateral step shift, and then examined numerous
escalator steps for lateral shifting along the incline, and noted a 1/8 in
variance in the step/skirt gap, which in some cases, caused the steps to
make contact with the adjacent skirt panel.  He further concluded that
the clearance (gap) between steps and skirts did not conform to
manufacturer's specifications of 1/16", and that the skirt panels had
not been lubricated.  Attached hereto below are two photographs
taken by Mr. Koshak which present the condition of the escalator
along with his corrected step/skirt measurements, as previously
mentioned.

*Id.* at 32, ¶ 5.1.

1. Mr. Stabler Relied on Information From Mr. Koshak's 2018 Site
   Inspection

Otis argues that Mr. Stabler's opinions must be excluded because they rely

on Mr. Koshak's 2018 site inspection;[12] namely, his step-to-skirt gap

measurements and observations regarding the damaged skirt panel.  Otis

---

[12]  Defendant misapprehends Otis' argument as challenging the fact that Mr.
Stabler did not attend the site inspection or inspect the escalator.  Otis in fact takes
issue with Mr. Stabler's reliance on a flawed inspection that does not accurately
reflect the condition of the escalator at the time of the incident.

specifically takes issue with opinion nos. 11.2, 11.5, 11.7, 11.7,[13] and 11.8. Mem. in Supp. of Mot. at 16-17. Additionally, Otis identifies the following sections from Mr. Stabler's report as having incorporated observations from Mr. Koshak's site inspection: 1.14; the discussion on page 31 concerning skirt panel damage; 5.1; Exhibit 5A to Mr. Koshak's deposition; and a photograph of the damaged skirt panel. *Id.* at 4-5.

Defendant counters that Mr. Stabler did not use the 2018 inspection to opine about the actual condition of the escalator at the time of the incident and that his opinions are proper because the 2018 site inspection was utilized in conjunction with his extensive industry experience and understanding of the evidence in this litigation. At the *Daubert* hearing, Mr. Stabler testified that Mr. Koshak's site inspection merely bolstered his opinions. Doc. No. 408 at 55:6-56:3; 57:6-9. Mr. Stabler proffered that the site inspection increased his certainty of his opinion only to the extent it confirmed Otis' pattern and practice of negligence. *Id.* at 56:10-57:9.

With respect to step-to-skirt entrapments, Mr. Stabler testified at his deposition that

> [i]t's a fundamental component of the wear and the other aspects identified in Arthur D. Little's report, and well-known throughout the industry for years and years.

---

[13] There are two separate opinions identified as 11.7.

It's also a function of performing the Step/Skirt Performance Index Test, which was not performed in this case prior to the incident. That information would have provided all the relevant and specific facts about – had it been done properly, would have provided that relevant information consistent with Mr. Koshak's testing.[14]

Reply, Ex. A at 75:10-21. Mr. Stabler's causation opinion was based on the damaged skirt panel and the lack of lubrication.

    a. <u>Damaged Skirt Panel</u>

When asked at his deposition whether the escalator's condition observed by Mr. Koshak in 2018 is the same as the condition on September 10, 2014, Mr. Stabler responded:

> A.    With 100 specificity and degree of certainty, no; however, if you look at the facts and the evidence in the case and that Dr. Kim and W.K. entered the subject escalator and descended to approximately one-fifth of the way down, and you look at Mr. Koshak's report which identifies a specific number of steps, I believe 23 of the exposed 35, as to where the damaged skirt panel was, then yes, I believe I can say with a higher degree of certainty that that more than likely caused or contributed to this particular incident.
>
> The other facts are that Otis does not and has not categorically, for years, lubricated or applied a friction-reducing agent to their skirt panels, even though they know in 1983 and 1984 they had developed the guardian skirt panel, which was an extruded aluminum panel with an anodized surface that would facilitate a friction-reducing agent, if you will, in the field.

---

[14] Mr. Stabler noted that the test performed by Otis after the incident was conducted improperly and as a result, the data is incorrect. Reply, Ex. A at 75:22-24.

Q.      So is it your opinion that that damaged portion of the skirt panel that Mr. Koshak photographed and that I believe you have also included in your report, on page 33, that's the damage to which you were referring?

A.      Yes, that's part of it, but it's also in conjunction with the striations that I mentioned in my report. I then alluded to and will testify to here today, those striations can only come from the steps abrading against the skirt panels. And again, as I testified previously, that's due to misalignment of the step and/or improper step chain tensioning and/or cumulative wear on the escalator, all of which is foreseeable and preventable under proper preventative maintenance.

Q.      So looking at this photo you have on page 33 of your report --

A.      Yes.

Q.      -- is it your opinion that the condition of this skirt panel we see on this photo on page 33, this photograph taken in 2018, is the same condition as it was in 2014?

A.      As I said, I can't say with 100 percent certainly, but these types of wear occur over time. So if you look at the leading edge of the skirt panel on the downward slope, it's actually pulled and rippled. That's a clear indication that abrasion has occurred over time, sometimes so substantive that it causes the metal to peel back.

    To say with 100 percent certainty that's exactly the condition at the time, I cannot. But to say that it was causally related – because as you wear the metal – and that skirt panel is basically just a piece of stainless steel that's clad to either a wooden member or a metallic member to hold it in place.

    As it wears it develops a knife-like edge, such that if you were to take any component, a shoe, a leather shoe, or even a heavier boot, it could actually potentially grab it, and then as an end result cause the peeling to further involve an engulfment of the step and the skirt and/or the subject footwear.

Reply, Ex. A at 75:25;76:4-22.

Although Mr. Stabler opined that the damaged skirt panel contributed to the

entrapment, he clarified that the exact condition did not exist in 2014:

> Q:      . . . . Based on the observations of Mr. Koshak of this skirt
> panel that we've been discussing, in 2018, you are not saying that it
> had this exact same condition in 2014, are you?
>
> A.:      No, sir.  I'm saying, but fundamentally the components that
> would cause of contribute to that were in existence.  They were likely
> in their infancy, based on abrasion and the absence of adjustment and
> continual abrasion and wear, and ultimately produced a condition like
> this that's been photographed.
>
>        The other concern and opinion that I have is that, had Otis been
> doing their job in accordance with the Step/Skirt Performance Index,
> this would have been identifiable and, in accordance with the adopted
> code and enforced code, should have been repaired.

Opp'n, Ex. 2 at 80:11-81:1.  Ultimately, Mr. Stabler testified that as to the

damaged skirt panel, he can say with approximately 85% certainty "that there was

a disconnect between the skirt panel abutment and alignment, which caused or

contributed to the subject incident."  Reply, Ex. A at 169:23-170:1.

> b.  Step-to-Skirt Gap Measurements in Figure 19/Exhibit 5A to Mr.
>     Koshak's Deposition

Mr. Stabler incorporated Exhibit 5A to Mr. Koshak's deposition into his

report.  Mot., Ex. B at 34.  Mr. Stabler explained at the *Daubert* hearing that he

relied on Mr. Koshak's step-to-skirt gap measurement data only insofar as those

measurements collectively exceeded the measurements allowed by code.  Doc. No.

408 at 52:22-53:9.  However, he conceded that his opinion nos. 11.4 and 11.5[15]

relied at least in part on Exhibit 5A, with all documents and materials serving as

bases for his opinions.  *Id.* at 53:13-54:15.  As explained above, even with

corrections, Exhibit 5A contained numerous errors.

The Court already concluded that the subject escalator's condition in 2018 is

not reflective of its condition at the time of the incident, and that the requisite

logical connection is lacking.  This resulted in the exclusion of Mr. Koshak's

opinions, discussions, evidence, and/or testimony regarding noncompliance, the

step-to-skirt gap measurements, and the damaged skirt panel to the extent the

opinions rested on the presumption that the escalator's 2018 condition reflects its

condition at the time of the incident.  The Court also excluded as unreliable

opinions founded upon or corroborated by the step-to-skirt measurement data in

Figure 19 and Exhibit 5A due to the high rates of error therein.  Given this

backdrop, Mr. Stabler's opinions premised on conditions observed at the site

inspection must correspondingly be excluded.

Mr. Stabler has conceded that opinion nos. 11.4 and 11.5 relied in part on

Exhibit 5A.  Insofar as the step-to-skirt measurement data is unreliable and does

---

[15]  Mr. Stabler also represented to the Court that he could have rendered this
opinion without the site inspection findings because he "described the conditions
that were apparent at the time of the incident and were photographed and present
evidence of the step/skirt abrasion."  Doc. No. 408 at 55:6-15.

not reflect the escalator's condition at the time of the incident, these opinions and all related discussions, evidence, and/or testimony must be excluded. The remainder of Mr. Stabler's opinions do not appear to rely on Mr. Koshak's observations from the site inspection. Mr. Stabler's report, the record presented with the Motion, and his *Daubert* hearing testimony indicate that the remaining opinions were formed independent of the site inspection and are based on document review, as well as Mr. Stabler's expertise in escalator maintenance. Therefore, Mr. Stabler's remaining opinions will not be excluded, nor related discussions, evidence, and/or testimony.

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Otis' Motion to Preclude Testimony of Joseph L. Stabler and Strike Report of Stabler Associates, Inc.

## CONCLUSION

In accordance with the foregoing, the Court GRANTS IN PART AND DENIES IN PART Otis' (1) Motion to Preclude Testimony of John W. Koshak and Strike Report of Elevator Safety Solutions and (2) Motion to Preclude Testimony of Joseph L. Stabler and Strike Report of Stabler Associates, Inc.

IT IS SO ORDERED.

DATED: Honolulu, Hawaiʻi, February 25, 2019.

Jill A. Otake
United States District Judge

CIVIL NO. 16-00460 JAO-KJM; *KIM V. CROCS*; ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANT/THIRD-PARTY DEFENDANT/CROSS-CLAIMANT/CROSS-CLAIM DEFENDANT OTIS ELEVATOR COMPANY'S MOTION TO PRECLUDE TESTIMONY OF JOHN W. KOSHAK AND STRIKE REPORT OF ELEVATOR SAFETY SOLUTIONS, INC.; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT/THIRD-PARTY DEFENDANT/ CROSS-CLAIMANT/CROSS-CLAIM DEFENDANT OTIS ELEVATOR COMPANY'S MOTION TO PRECLUDE TESTIMONY OF JOSEPH L. STABLER AND STRIKE REPORT OF STABLER ASSOCIATES, INC.